United States District Court
Western District of New York

United States of America,
                    *Plaintiff*

                                    Defendant's Pretrial Motions III:
             *vs*                   Discovery, Particularization,
                                    Surplusage

Ezzat Soliman, M.D.
                 *Defendant*        Indictment № 06-Cr-00236-RJA-
                                    HBS

The accused, by the undersigned, and based on the annexed affidavit of Mark J. Mahoney, hereby moves for the following relief, as specified in the attached Schedules:

1.      Discovery pursuant to Rule 16 FRCrP and the 5th Amendment Due Process clause, and the 6th Amendment Right to Present a Defense.

2.      A Bill of Particulars pursuant to  FRCrP Rule 7(f) .

3.      Striking of surplusage from the indictment and forfeiture allegation, pursuant to  FRCrP Rule 7(d) and the 5th Amendment  to the U.S. Constitution and  18 U.S.C. § 3282.

December 3, 2007                     /s/ Mark J. Mahoney
                                    _____
                                    Mark J.  Mahoney
                                    HARRINGTON & MAHONEY
                                    1620 Statler Towers
                                    Buffalo, NY 14202-3093
                                    Tel: 716-853-3700
                                    Facs: 716-853-3710
                                    mmahoney@harringtonmahoney.com
                                    *Attorneys for Ezzat Soliman*

To: Robert G. Trusiak, AUSA

# Contents

Schedule 1: Discovery................................................... 1

    Introduction:  Definition of Terms............................ 1

    Statements................................................ 1

    Examinations, Tests, Experiments............................ 1

    Experts: Opinions and Facts................................. 2

    Grand Jury................................................ 2

    Prior, Subsequent Searches.................................. 3

    Documents - Rule 16(a)(1)(E)................................. 3

        Documents and property seized from the accused......... 3

    Health Care Benefit Programs................................ 4

    Other Health Care Benefit Programs.......................... 6

    Third Party Documents...................................... 6

    Tapes, Photographs, electronic surveillance................... 7

    Physical evidence.......................................... 7

    Former Employees ......................................... 7

    Information relevant to the preparation of the defense........... 8

    Favorable Information...................................... 8

        Impeaching information. ............................. 10

    Alleged prior misconduct................................... 11

    Electronic Format.......................................... 11

    Tapes..................................................... 13

    Timing of disclosure....................................... 13

        Favorable Information............................... 13

Schedule 2: Bill of Particulars........................................... 15

    Counts 1-64............................................... 15

    Forfeiture. ................................................ 16

Schedule 3: Surplusage. ................................................ 17

    Indictment................................................ 17

    "Forfeiture Allegation"..................................... 17

Affidavit in Support of Defendant's Pretrial Motions..................... 18

Bill of Particulars..................................................... 19

Discovery........................................................... 19

    Statements................................................ 19

    Scientific evidence, Experts................................. 20

    Grand Jury materials - Hearsay and Summary Evidence......... 21

    Prior, Subsequent Searches.................................. 22

Documents - Rule 16(a)(1)(E). . . . . . . . . . . . . . . . . . . . . . . . . . . 23
    Documents and property seized from the accused. . . . . . . . 23
    Material to the preparation of the defense – third party
        documents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
    Material to the preparation of the defense – Health Care
        Benefits Programs . . . . . . . . . . . . . . . . . . . . . . . . . 24
    Other documents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
    Tapes, photographs, recordings, electronic surveillance. . . . 27
Former Employees. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
Favorable information. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
    Timing of disclosure  — Favorable Information. . . . . . . . . . 32
Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

# Schedule 1: Discovery

The defendant moves for discovery pursuant to Rule 16 FRCrP and the 5th Amendment Due Process clause, and the 6th Amendment Right to Present a Defense, of the following items and under the following conditions:

### Introduction:  Definition of Terms

**Document**:  As used herein, the term "Document" includes reports, correspondence, lab notes, memoranda, sketches, lists, charts, computations, electro magnetic recordings, video tapes, film, photographs, "electronically stored information" as understood under FRCP 34(a)(1)], accounting data and statements and reports, and the like, which are within the government's possession, custody or control or "reasonably accessible" to the government, or which with the exercise of diligence on the part of the government could be brought within the government's possession, custody or control. Discovery is requested in "electronic format" wherever applicable.  See ¶71, *et seq.* below.

**Report**:  As used herein, the term "Report" includes both written and oral communications.

**Conversation:**  The term "Conversation" as used herein refers to any electronically intercepted oral or telephonic communication or any videographic recording of a conversation or meeting.

**Health Care Benefit Programs**: This includes not only the Health Care Benefit Programs as defined in the indictment, but any "Carriers" who are contracted by the Health Care Benefits Program, especially Medicare, to process claims and make payments

### Statements

1.     Any written, recorded, oral or observed statement of the defendant or attributed to the defendant including notes, summaries or memoranda concerning such statements;

2.      Any transcript of testimony or written, recorded, oral or observed statement of (1) any agent or employee, claimed to have been able legally to bind the Defendant in respect to the subject of the statement, or (2) by any uncharged co-defendant or co-conspirator.

### Examinations, Tests, Experiments

3.     Any documents concerning any physical or mental examination, or scientific

test or experiment relating to this case, including any evaluation of the claims submitted by Dr. Soliman, or the medical services on which those claims were based, in any fashion, including in relation to billing codes.

[As used herein, "concerning. . . examination, . . . test or experiment" includes preparation for, conducting of, immediate results of, and evaluation of the results of such procedures, for example "lab notes" or checklists or graphic or otherwise recorded output of analytic instrumentation].

### Experts: Opinions and Facts

4.      Transcripts of any testimony given relative to any physical or mental examination, or scientific test or experiment relating to this case, specifically including any testimony reporting on any clinical observations or review of medical records of any type relative to the investigation of this case, or other expert opinions relevant to the charges.

5.      Transcripts of any testimony given by any person in relation to this case offered, or which are intended at trial to be offered, concerning "expert facts" offered because the facts are not commonly known to the jurors and are believed helpful or necessary to the determination of any issue in the case.

6.      A summary of the testimony of any proposed expert witness, describing the witness' testimony, the data upon which the witness will testify and the bases for the opinions or factual evidence to be offered.

7.      Any prior occasions on which that expert has testified on a similar subject, including any transcript of that testimony.

8.      A current and detailed *curriculum vitae* for any proposed expert witness.

### Grand Jury

9.      A statement as to the extent of use of "summarized" testimony, or hearsay

SCHEDULE 1: DISCOVERY                              **Documents - Rule 16(a)(1)(E)**

testimony, in lieu of direct testimony by those with direct knowledge, by government agents, or investigators, accountants, experts, employees and any other person, indicating the specific counts of the indictment for which the evidence was supplied by summaries of "evidence" and the nature of the evidence summarized. Specifically in this case involving allegations of false health care claims, the extent to which the grand jury was presented with purely summary information about the claims rather than the claims themselves.

10.    The legal instructions provided to the grand jury, especially as to the nature of a scheme, the missing elements in the indictment of effect on interstate commerce, and materiality.

11.    Any orders or directives, whether written or oral, compelling any person to submit to medical procedures or examinations, including the basis on which such orders or directives were made.

## Prior, Subsequent Searches

12.    Any documents or information concerning the existence of any entry, under any conditions pretext or authority, by any federal or state investigators or persons acting on their behalf or on their request, upon the premises of 446 North Main Street, Warsaw, New York, prior to or subsequent to the execution of the search warrant herein on or about December 17, 2004, relevant to the investigation of Dr. Soliman.

## Documents - Rule 16(a)(1)(E)

*Documents and property seized from the accused*

13.    In the execution of the search warrant the government obtained numerous boxes of documents, and other materials. It appears that those concerns are being resolved, so that issue will not be addressed here. Instead it is reserved in case there persists any problem in that area.

3

SCHEDULE 1: DISCOVERY                                    **Health Care Benefit Programs**

14.    All documents, obtained from the Genesee County Sheriff's Department or any other law enforcement agency, which were taken from Dr. Soliman's office  directly or indirectly by any other person, including any employee of Dr. Soliman FRCP 16(a)(1)(E)(iii).

15.    All documents which the government intends to use at trial. FRCP 16(a)(1)(E)(ii) .

16.    All documents "material to preparing the defense," FRCP 16(a)(1)(E)(I) including documents any documents such as sought in the following requests in paragraphs.

### Health Care Benefit Programs

17.    Any documents obtained from any Health Care Benefit Programs relating to the accused or the investigation of the accused.  As used in this section,  "Health Care Benefit Programs" refers to those programs referred to in counts 1-64 of the indictment, and any predecessors or successors thereto.

18.     Any documents obtained from any **"Independent Practice Association" ("IPA")** involved in the billing or contractual arrangement between Dr. Soliman and the Health Care Benefit Programs.

19.    Any contracts between Dr. Soliman and any such Health Care Benefit Program or between either Dr. Soliman or any such Health Care Benefit Program and any IPA.

20.    All claims submitted by the accused or on his behalf or with his Provider Number on them to any such Health Care Benefit Program during the period of January 1, 2001 through August 2005.  "Claims" include any documents made or submitted in connection with a claim for reimbursement, including cover letters, attachments, etc.

21.    All documents related to the processing and payment of any such claims, including any offsets, deductions or "withholds"  by such Health Care Benefit Programs during the same time period.

22.    All documents reflecting communications, in either direction, of any sort

between the accused, or anyone acting on his behalf, and any such Health Care Benefit Program relating to the same time period.

23.     All documents reflecting communications, in either direction,  of any sort between the accused, or anyone acting on his behalf, and any IPA relating to  the same time period.

24.     Documents reflecting or relating to the pattern or practices of Dr. Soliman in completing and submitting claims to such Health Care Benefit Programs relating to the same time period.

25.     Documents reflecting or relating to the patterns and practices of such Health Care Benefit Programs, and relevant to the same time period, in the processing and payment of such claims.  This includes manuals, training materials, guidelines, checklists, and directives for employees reviewing claims at any stage of the process.

26.     Documents reflecting or relating to any policies, procedures, or guidelines on the part of such Health Care Benefit Programs concerning monitoring of the billing practices of physicians during the same period including all versions and revisions thereof, and for each such Health Care Benefit Program identify which set of Centers for Medicare and Medicaid Services (CMS) E/M guidelines were being used over any time period encompassed by the indictment.

27.     Documents reflecting actual practices of such Health Care Benefit Programs concerning monitoring of the billing practices of physicians during the same period including all versions and revisions thereof, e.g. sampling and audit protocols, checklists.

28.     Any documents relating to any specific or routine examination or investigation or audit by any such Health Care Benefit Programs concerning Dr. Soliman's billing practices  ("Report Cards" etc).

29.     Any documents relating to any specific or routine examination or investigation

5

SCHEDULE 1: DISCOVERY                                    Tapes, Photographs, electronic surveillance

or audit by any IPA concerning Dr. Soliman's billing practices ("Report Cards" etc).

30.      Documents reflecting or relating to any efforts on behalf of such Health Care Benefit Programs, during the same time period, to communicate with Dr. Soliman in any way concerning  such patterns and practices, or their failure to so communicate.

31.      Any documents within or among such Health Care Benefit Programs relating to Dr. Soliman, relating to his billing practices, to any investigation or audit by any state or governmental agency into his billing practices.

32.      Any documents within or among such Health Care Benefit Programs relating to "re-credentialing" Dr. Soliman or reviewing or renewing his contractual arrangement with such Health Care Benefit Programs.

33.      For each Health Care Benefit Program provide a list of each relevant electronic system that has been in place at all relevant times for the collection of data and the payment for services and the storage of documents, including a general description of each system, including the nature, scope, character, organization, and formats employed in each system and any archive or backup systems.

### Other Health Care Benefit Programs

34.      Any documents such as described above relating to Health Care Benefit Programs not referred to in the indictment relating to Dr. Soliman and his billing practices.

### Third Party Documents

35.      Any documents obtained from any third parties including banks, financial institutions, credit reporting agencies, or the like relating in any way to the indictment or the investigation or the accused which lead up to the indictment or since the indictment.

36.      Any documents obtained from any **utility companies, services providers** or the like relating in any way to the indictment or the investigation or the accused which lead

up to the indictment or since the indictment.

37.    Any documents obtained from any **common carriers** whether for packages, information, data, or persons, including telephone records, or the like relating in any way to the indictment or the accused or the investigation which lead up to the indictment or since the indictment.

## Tapes, Photographs, electronic surveillance

38.    Copies of all video or audio tapes made in connection with the investigation by any agency.

39.    A precise description of the form and location of the original recordings, and the process by which the current copy was created.

40.    Any photographs made in connection with the case.

41.    Any charts, graphs, maps or drawings related to the investigation and prosecution of this case.

42.    A statement by the government as to the existence of any pen registers or the use of any other trap or trace devices, or any means of electronic surveillance of any type, under any authority.

## Physical evidence

43.    All physical evidence collected or seized in connection with the case, including copies of all property capable of being photocopied or reproduced.  The source and date and time of recovery, as well as the authority under which the property was obtained must also be disclosed.

## Former Employees

44.    Names and addresses and telephone numbers of all former employees of Dr. Soliman.

45.     Statements of any former employees.

46.     A curative communication from the government or the Court to all former employees of Dr. Soliman encouraging them to cooperate in the defense investigation, and authorization to depose any former employees and to compel them to attend a deposition in the event that they are not cooperative.

### Information relevant to the preparation of the defense

47.     All documents which are material to the preparation of the defense, which includes all documents relevant to the investigation which are not privileged.

### Favorable Information

48.     All material evidence or information, whether admissible at trial or not, whether regarding facts or occurrences or the absence of facts or occurrences, known to the prosecutor or which could become known upon diligent inquiry to those under the prosecutor's direction or control, which is in any way favorable to any defendant, whether by detracting from the prosecution's case or the credibility of the prosecution's witnesses, or supportive of the positions urged, or likely to be urged, by any defendant at any stage of the proceedings.

49.     Any policies, records, directives, settlement agreements, orders and the like relating to the duty of any Health Care Benefits Programs to educate physicians on correct billing procedures, to alert them to irregular billing practices, and resolve misunderstandings or disputes regarding billing and billing codes.

50.     Any information reflecting the identification of Dr. Soliman's billing practices being out of the expected or acceptable range collected in any form by any of the Health Care Benefits Programs, and any and all records or information as to what the Health Care Benefit Programs did with that information.

51.     Any evidence reflecting the failure of any of the Health Care Benefits

Programs to enforce or implement these policies in general or specifically in the case of Dr. Soliman.

52.     Evidence and records suggesting that Dr. Soliman submitted medical notes in conjunction in support of any claims now alleged to be false, as well as what was done with that information.

53.     Any statements known to be false or erroneous or conflicting made by persons intended to be called as witnesses.

54.     Any statements, records or information indicating that any prospective witness has given contradictory or deceitful information in the course of the investigation of this case.

55.     Any information indicating that any prospective witness has given information inconsistent or materially different from information received from other more reliable sources.

56.     Names and addresses and statements of any persons interviewed by or on behalf of the Government or who are known to have been witnesses to the events underlying the charge whom the Government does not intend to call as witnesses.

57.      The existence of any government agents or  information or cooperating individuals in this case and any representation, offer, agreement or understanding regarding any past, present, or future benefit to such persons as a result of or in relation to their cooperation with the prosecutor.

58.     Any information to the effect that the instant prosecution is based on or derived from evidence acquired as a result of Governmental action violative of Constitutional standards.  This request expressly encompasses any information which might affect the Court's decision on a suppression issue in a fashion favorable to the Defendant.

59.     Any other records or information which arguably could be helpful or useful to

the defense in impeaching or otherwise detracting from the probative force of the prosecution's evidence or which arguably could lead to such records or information.

*Impeaching information*

60.    The defense also requests information which could be utilized for the impeachment of prosecution witnesses, including specifically the disclosure of any of the following within  the possession, custody or control of the prosecution or  which, with due diligence could become known to the prosecution:

61.    Any records or information revealing prior  convictions or juvenile adjudications attributed to each  witness to be called by the government, including but not limited to relevant "rap sheets."  Any records, including police personnel records, or information revealing prior misconduct or bad, vicious or immoral acts on the part of any witness.

62.    Any consideration or promise of consideration or expectation of consideration which obtains with respect to any witness intended to be called by the prosecution, including, but not limited to leniency, favorable treatment, assistance  with respect to any pending legal proceeding, claim for reward  or fees, including witness fees or special provisions for protection, food, clothing, shelter, transportation, or other benefits, or anything else which arguably could reveal an  interest, motive, or bias of the witness in favor of the  prosecution or against the defense or act as an inducement to  testify or to color testimony.

63.    Any threats, express or implied, direct or indirect or other coercive measures directed against any witness; such as threats of criminal prosecution or investigation or potential prosecution, any probationary, parole, deferred prosecution or custodial status of the witness or any civil, tax court, court of claims, administrative, or other pending or potential legal disputes or transactions with the prosecution or over which the prosecution has a real, apparent, or perceived influence.

64.    Any information as to any prospective prosecution witness having a history of

mental or emotional disturbance.

65.    The existence and identification of each occasion on which any witness has testified before any court, grand jury, or other tribunal or body or otherwise officially narrated in relation to the defendant, the investigation, or the facts of this case.

66.    The existence and identification of each occasion on which each witness who was or is an informer, accomplice, co-conspirator, has testified before any court, grand jury, or other tribunal or body.

67.    Whether any witness has commenced or contemplates commencement of a civil action against the accused.

68.    The same records and information requested in the paragraphs above is also requested with respect to each non-witness declarant whose statements may be offered in evidence.

## Alleged prior misconduct

69.    Any alleged criminal or immoral conduct on the part of the defendant intended to be used against any defendant on the governments direct or rebuttal case.

70.    Any alleged criminal or immoral conduct on the part of the defendant intended to be used in the examination of the defendant should he testify at trial.

## Electronic Format

71.    For those documents which exist or existed as electronically stored information, we request production in the format in which they were obtained, or some other agreed to reasonably useable format.  A sample of any such files should be produced in order to permit mutual agreement as to the format for disclosure.

72.    For this purpose, and for the purpose of regulating disclosure by third parties to conform to these guidelines, it is requested that the government and the affected third

**Electronic Format**

parties shall engage in discussions regarding the production of electronic documents in this case. The discussions should be attended by a representative of each Health Care Benefit Program or IPA with sufficient knowledge of that party's electronic documents to enable a good faith effort to resolve all issues regarding the production of electronic documents without court action.

73.     Scanned images should be from an original rather than a copy and in standard image format (TIFF or PDF).

74.     For documents obtained in a format other than electronic, if produced as scanned images of documents, in an electronic format or arrangement that preserves the original file, file folder, and document structure of the documents or which contains an index or "load file" permitting the import of the image files into software available to the defendant in a manner which allows replication of the original file, file folder, and document boundaries of the documents.

75.     Images should be uniquely numbered with "Bates" numbers with an appropriate prefix to indicate the source, such as MED, EXC, UNI, SOL for this case.

76.     Fielded data relating to individual documents (box number, exhibits, etc.) should be provided in a database format or in an  ASCII format in a delimited structure (i.e. tab, CSV, etc.)

77.     Every document described above which is required to be supplied in "hard copy" shall also be provided in electronic format if it exists in that format without regard to whether, such as a transcript, it was originally created in electronic format or it was converted to an electronic format from original hand written notes.  In the event that the original format is unreadable on the defendants' equipment, then the government shall endeavor to provide the information in ASCII or other readable format.  This would include all documents originally prepared in a word processing format, as well as any other documents which have subsequently, by scanning and optical character recognition, or keyboard operation, been

**Tapes**

converted to electronic format.

78.     This also includes any database or accounting records or other records provided to the government by insurance companies, administrators of group insurance programs, or vendors.

## Tapes

79.     If any tapes made in connection with the case were originally created in digital format, we move that the digital master shall be made available to the defense for copying in digital format.  If tapes are supplied in digital format, they should be supplied with the same markings and indexing information referred to in the next paragraph.

80.     Otherwise, we move that analog tapes shall be provided to the defense by supplying complete sets of all the tapes created in connection with the investigation with reproduced sound quality equivalent to the original tapes.  Such tapes shall be clearly marked with information sufficient to identify the conversations contained on each using a log or table supplied to assist defendants to locate conversations separately identified in any transcripts, logs, or summaries.

## Timing of disclosure

### *Favorable Information*

81.     In order to effectuate the Right to Present a Defense which is embodied in the compulsory process clause of the Sixth Amendment, and to the right to a fair trial, all favorable information, *including favorable information useful to impeach government witnesses*, must be disclosed to the accused immediately or as soon as its existence comes to the attention of the government or its agents.  See October 19, 2006 Memorandum from the Deputy Attorney General, relating to the addition of §9-5.001 to the United States Attorney's Manual. ("Exculpatory information must be disclosed reasonably promptly after it is

**Timing of disclosure**

discovered.")[1]

---

[1] Of course the Manual is incorrect in describing the material required to be disclosed as "exculpatory." The Supreme Court in *Brady v. Maryland*, the subject of the memo, never used the word "exculpatory." It referred to "favorable information."

# Schedule 2: Bill of Particulars

The defendant moves for  particularization of the indictment as follows:[2]

1.      State the manner and place and time on which it is alleged that the accused ever "instructed the billing clerks that he employed to bill the highest office-based E&M code" as stated in ¶25 of the indictment.[3]

## Counts 1-64

2.      For each count of the indictment, specify (by every  unique combination of "Bates" number and range, computer file and path name, claim number, date, patient, date of service) any documents submitted as part of the claim for reimbursement at issue.

3.      For each count, state the precise additional amount of money, if any, alleged

---

[2]  The government has acceptably particularized most of our requests, as follows:

76. For each count, state "the actual services provided to patients by the defendant" (see ¶23) which is alleged to have called for a lower and less costly level of services than that billed by the defendant, specifying, for each, what is claimed to be the proper code for the service.

> GOVERNMENT RESPONSE: The defendant failed to document in the medical record for each count in the indictment the level of service required by 99215 or 99205 concerning a comprehensive examination, comprehensive history and/or a complex medical decision.

77. For each count, state the precise "false statements" or "misrepresentations of fact" (see ¶24) alleged to have been made.

> GOVERNMENT RESPONSE: The response includes the submission of a HCFA 1500 claim form for an undocumented level of service.

78. For each count state what, if anything, was done by the defendant which "caused false statements and misrepresentations of fact to be made." ¶24

> GOVERNMENT RESPONSE: The response includes the submission of a HCFA 1500 claim form for an undocumented level of service.

79. For each count, state the precise "non-rendered clinical services," if any, referred to. (see ¶26)

> GOVERNMENT RESPONSE: The defendant failed to document in the medical record for each count in the indictment the level of service required by 99215 or 99205 concerning a comprehensive examination, comprehensive history and/or a complex medical decision.

**As to other requests**, the government has not refused, but we are awaiting its response, promised "under separate cover."

[3]  This request appears to be the only contested request for particularization.

to have been received as a result of any "upcoding" or billing for "non-rendered clinical services."  (See ¶26)

4.      Specify each count where the liability of the accused is claimed to derive from application of § 2 of Title 18, specify the actions of the accused which render him liable for the conduct of the principal actor.

5.      For each such count, identify the principal actor.

## Forfeiture

6.      Specify the "gross proceeds traceable to the offenses described in such violations" and the basis for that determination.

7.       Specify the "net" proceeds - the difference between what was paid and what the grand jury alleges the amount was which should have been billed on each claim.

8.      Specify the basis for the claim that any individual item of real property or any motor vehicle is subject to forfeiture.

# Schedule 3: Surplusage

The accused moves pursuant to F.R.Crim.P. Rule 7(d) the 5th Amendment to the U.S. Constitution and  18 U.S.C. § 3282 to strike "surplusage" from the indictment which is"immaterial and irrelevant" and prejudicial.

## Indictment

1.     The indictment contains 64 counts, each count actually being only an act thought to be in furtherance of the multiplicitously alleged "scheme."  However, the time period of the alleged "scheme" in ¶¶1 -2 of the indictment extends forward and backward from the time period in which those acts are alleged to have occurred.    Allegations of wrongdoing extending beyond what is alleged in the indictment prejudicially exposes the accused to conviction on the basis of uncharged and undefined acts for which he is unable to prepare a defense.  Thus the allegation of earlier beginning and later ending points to the "scheme" must be stricken.

## "Forfeiture Allegation"

2.     The forfeiture allegation in the indictment seeks forfeiture of the "gross proceeds traceable to the offense."  Here there are no allegations that services were not performed or that they were not necessary.  Since forfeiture must be as to the *net* amount obtained as a result of any offense, this allegation must be stricken, or else modified to refer to "net" and an amount corresponding to the incremental amount the accused is alleged to have obtained *above* what he was entitled to, not the "gross amount" billed.

17

United States District Court
Western District of New York

---

United States of America,

        *Plaintiff*      Affidavit in Support of Defendant's
                              Pretrial Motions III:

        *vs*             Discovery, Particularization,
                              Surplusage

Ezzat Soliman, M.D.

        *Defendant*     Indictment № 06-Cr-00236-RJA-
                              HBS

---

Mark J. Mahoney affirms to be true and states under penalty of perjury as follows:

1.      I am the attorney for the accused, and I make this affidavit in support of the Defendant's "Pretrial Motions III" relating to Discovery, Particularization, and Surplusage.

2.      In the motion itself there are numerous statements of fact which are true, to the extent that they are facts indicated as being within the knowledge of counsel for the defense and which are otherwise believed to be true.

3.      The various grounds for relief in this case are based at times on facts, and representative facts, known to the undersigned and evident in the documents, proceedings, and in my own investigation.

4.      Because many of the facts of this matter apply to more than one motion, the factual allegations of each of the affidavits in support of each of the separate Pretrial Motions is incorporated into every other.

5.      However, my ability to assert all the facts, or know all the facts, is limited by the reality that I do not have the ability to compel evidence at this stage of the proceedings, and by my lack of information still now in the possession of the government, or reasonably accessible to the government, or in the hands of third parties.

6.      Additionally, the granting of the discovery sought in these Pretrial Motions, hearings, and even extraordinary means of discovery may  be necessary to protect the rights

of the accused to necessary discovery, a fair trial, and to allow the accused to fully and fairly adjudicate his claims to relief on these motions and the reserved motions.

# Bill of Particulars

7.      All of the particulars sought are necessary for the accused to be able to prepare a defense, to prepare to prove their innocence.

8.      As to request ¶1 the government has refused.

9.      As to request ¶¶2 - 8, based on the earlier requests which they replicate, we believe the  government has promised to provide this "under separate cover" from it s original response to our particularization demand.

# Discovery

10.     The following categories of property are authorized for disclosure either under the literal terms of FRCrP 16 and "are material to the preparation of the defendant's defense or are intended for use by the government as evidence in chief at the trial, or were obtained from or belong to the defendant," or are otherwise discoverable under other rules, or required to be disclosed in order to protect the constitutional rights of the accused, including the Right to Present a Defense, under the compulsory process clause, the right to a fair trial, and the right to confrontation.

## Statements

11.     Obviously any statements attributed to the accused must be disclosed to the defense under Rule 16 and especially if those statements are considered any "verbal acts" constituting part of the conduct making up the alleged offense.

12.     Statements of others which may be attributed to the accused by  (1) any agent or employee, claimed to have been able legally to bind the Defendant in respect to the subject

of the statement, or (2)  by any uncharged co-conspirator must also be disclosed if sought to be used as evidence against the accused.

## Scientific evidence, Experts

13.    The government has informed us only that "[t]he government does intend on introducing expert testimony from medical directors and representatives of payor claims review units concerning the documentation requirements for CPT codes 99215 or 99205." That, then will presumably be the limit of the expert testimony offered.

14.    As narrow as this statement is, it does not do away with the requirement of disclosure.  We are entitled to know, and need to know, what the opinions are, the basis for them, and the other information required under Rule 16.  This information is absolutely necessary to either prepare for cross examination of scientific witnesses, or to obtain the assistance in advance of trial of appropriate expert witnesses on behalf of the defense.  This information in required to be provided now pursuant to Rule 16(a)(1)(E).

15.    Based on this response we also assume that no patient of Dr. Soliman was subjected to any medical examination or the taking of any medical history.  If that is not so, then any documents results relating to such examinations must also be disclosed.

16.    The government has attempted to avoid providing expert discovery on an assertion that "the standard practice in this District" is that "the government will provide a detailed statement regarding the identity of the expert witnesses, their qualifications, the basis for their testimony, together with a summary of their testimony, *at the time the filing of the government's trial submissions*."

17.    This is not the  "standard practice," nor would such a practice be consistent with Rule 16 which, and especially the new additions to 16(a)(1)(E) designed to provide fuller disclosure to the defense in this important area.   The defense could not possibly determine what experts to hire, or even consult on the review of the prosecution's proposed expert testimony, and have time to raise any appropriate challenge to the "science"

**Grand Jury materials - Hearsay and Summary Evidence**

underlying the government's experts, without immediate disclosure of expert information.

18.     There is no reason not to immediately direct the government to provide this information.

19.     As to the scope of its discovery obligation, the government fails to address the documents created in connection with any examinations of materials or tests conducted by its experts. It is not just "reports" but "*results or* reports," and that includes any notes or memoranda concerning the formulation of their opinion.

20.     Here also, in the absence of a "report," the grand jury testimony of any expert can be ordered to be disclosed in order to satisfy the immediate need of the accused for this information.

## Grand Jury materials - Hearsay and Summary Evidence

21.     This case involves allegations of false claims submitted to Health Care Benefits Programs. From the course of discovery, however, it would appear that the grand jury never saw the actual claims sent by the accused to the Health Care Benefits Programs.

22.     This is evident from the fact that when we sought discovery of the actual claims in issue — what Dr. Soliman actually sent to the Health Care Benefits Programs — it was evident that the government did not have them, and had to obtain them from the programs themselves.

23.     What then becomes apparent, from the other information the government has provided to us, and what was presented in the search warrant application, is that, instead of the claims themselves, the grand jury was provided with some sort of assessment of the claims by witnesses either summarizing their review of some feature of the claims or hearsay information concerning the claims.

24.     The danger with such testimony is that it deprives the grand jury of the ability to directly assess the claims submitted, so that they can draw their own conclusions, instead

Prior, Subsequent Searches

of relying on the conclusions of others, the foundation for which the grand jury is not able to assess.

25.    Another form of hearsay evidence which the government has used, to obtain the search warrant, would have been highly prejudicial had it been used to obtain the indictment.  That would be evidence of "peer review" analysis discussed in the search warrant application which purports to find information of evidentiary value in the fact that other physicians may have billed at a lesser rate collectively, than the individual accused.  Not only is this evidence, about the behavior of others lacking in relevance, it incorporates many levels of hearsay.

26.    Therefore it is necessary for the government to disclose the extent to which, and the manner in which, summary or hearsay evidence was relied on by the government, and the extent to which the grand jury was informed that this is what it was receiving and cautioned about its duties in evaluating such evidence.

27.    Additionally, since the indictment is devoid of allegations concerning the necessary elements of effect on interstate or foreign commerce, or the requirement of materiality, the instructions to the grand jury on the offense itself and its elements should be examined to insure that the right of the accused to a properly brought indictment is protected.

### Prior, Subsequent Searches

28.    Our investigation, as well as the circumstances only recently revealed in the search warrant application, leads me to believe that the government may have obtained entry to the premises of Dr. Soliman's office prior to the execution of, or perhaps application for, the search warrant herein.

29.    Obviously, any information concerning any entries to the premises, on any claimed authority, prior to the search, or even subsequent to the search, must be revealed to us.

22

**Documents - Rule 16(a)(1)(E)**

## Documents - Rule 16(a)(1)(E)

Rule 16 provides for discovery of property (I) "material to the preparation of the defense, or which (ii) "the government intends to use" or (iii) the property "was obtained from or belongs to the defendant."

*Documents and property seized from the accused*

30.    In the execution of the search warrant the government obtained numerous boxes of documents, and other materials.  We have had months of discussions with the government over the manner in which we have been provided with discovery of this material. It appears that those concerns are being resolved, so that issue will not be addressed here. Instead it is reserved in case there persists any problem in that area.

31.    Before the criminal investigation in this case, there was an employee of Dr. Soliman's, who went by an *alias* of Karen Grisanti.  Her real name was Karen Solovey, and she has a lengthy criminal record relating to the use of narcotics, which she has obtained by using forged prescriptions stolen from doctors' offices.

32.    Before being fired by Dr. Soliman, at which time she had endeavored to extort money from him on the threat of making complaints against him, Solovey stole records from his office.  She is a person very familiar to the government and was interviewed by the government and she was relied upon heavily by the government in its application for a search warrant.

33.    She was later arrested by the Genesee County Sheriff's Department, on another controlled substances and forgery charge, believed to involve prescription pads stolen from Dr. Soliman, and was found to be in possession of patient medical records from Dr. Soliman's office.  Although we have been informed by the Genesee County authorities that they turned these records over to the government, the government has not provided them to

us.[4]

### Material to the preparation of the defense – third party documents

34.    The government and the grand jury may have obtained documents from a variety of third party entities, such as banks or financial institutions, utility companies, insurance companies, telephone companies, and so on.  As the collection of that information was or may have been material to the preparation of the case from the government's point of view, its review by the defense is also now required in order to allow the defense to prepare. Indeed, many of the records may actually belong to the defendant.

### Material to the preparation of the defense – Health Care Benefits Programs

35.    All documents obtained by the government from Health Care Benefits Programs are material to the preparation of the defense.  See ¶¶ 17 to 33 in the Discovery schedule.

36.    The government opposed production of this class of documents, on the grounds that some of it may not have been in the government's physical possession, and could be subpoenaed by the defense,  and by questioning the admissibility of such evidence.

37.    The criminal prosecution of the accused is simply based on an unusual pattern of medical billing.  There is no allegation that Dr. Soliman billed for medical treatment that was not performed or not necessary.  The only complaint is that he used billing codes that overvalued to some extent the services for 64 office visits billed over a three year period.

38.    The billing for these visits was done using a set of "CPT" and "E&M" codes published by the AMA, as described in ¶16 et seq. of the indictment.  These codes were not enacted by Congress, nor are they  incorporated into any federal statute.  The Health Care

---

[4] In its written response to our discovery demand,  the government misconstrued this request as being for documents taken from Dr. Soliman *by* the Genesee County Sheriff, which is not what we said.  In an e-mail communication on September 25, 2005, the government had indicated that it had obtained these records from the Sheriff.

**Documents - Rule 16(a)(1)(E)**

Benefits Programs make use of these codes to determine the rate of reimbursement to physicians for services. The codes pertaining to billing for office visits may or may not correspond to different rates of reimbursement, and different Health Care Benefits Programs may reimburse different amounts for the same "level" of medical services reflected in the billing codes.

39.    The process of billing for medical services and getting paid by the Health Care Benefits Programs is complicated.   The application of the codes depends on medical conventions and is subject to medical judgment.  In fact it is so complicated that most doctors hire services  to do their billing for them and to settle disagreements with the Health Care Benefits Programs when there are disputes as to the payments.

40.    Because of this, Health Care Benefits Programs have affirmative state and federal statutory duties and contractual obligations to educate physicians about using the billing codes, and to alert them if their billing practices  suggest a billing pattern that was contrary to the terms of his agreement with the Program or otherwise improper, and to assist them to make any needed corrections to any coding and billing practices.    For the "private payers" this duty arises by virtue of N.Y. Publ. Health L. § 4406-d(4).[5]  For Medicare this duty arises under the Medicare Modernization Act, Public Law No. 108-173, 117 Stat. 2066

---

[5]  § 4406-d(4) of the New York State Public Health Law requires health care plans to:

1.  Implement policies and procedures to ensure that physicians are regularly informed of information maintained by the health care plan to evaluate the performance or practice of the physician;

2.  Regularly consult with physicians in developing methodologies to collect and analyze profiling data;

3.  Provide physicians with the profiling and analysis data gathered in regard to that physician's practice on a periodic basis;

4.  Measure the profiling data against stated criteria and an appropriate group of physicians using similar treatment modalities and comparable patient populations;

5.  Provide physicians with an opportunity to discuss the unique nature of their practice which could have a bearing on the physician's profile; and

6.  Work cooperatively with the physician to improve performance and to amend coding and billing practices if the profiling data and evaluation show this is necessary.

of 2003 and the Progressive Corrective Action (PCA) initiative.[6]

41.     The Health Care Benefits Programs, especially Excellus and Univera, have audited and even sued Dr. Soliman, and this indictment would not have arisen without their influence upon the government.   Since before this criminal investigation, they had been aware of Dr. Soliman's response to their claims of "overcoding" and have no doubt tried to arm the government with arguments and information to counter his claims.  The data, the arguments, and the testimony which they have provided to the government is exactly what the defense needs to be able to avoid surprise at trial and to prepare to defend the case.

42.     All the Health Care Benefits Programs have a "SIU" or the equivalent, which would have done its own report or evaluation of Dr. Soliman's practice.

43.     For example, as requested in ¶¶ 17 through 33 of the discovery schedule, we are aware that the Health Care Benefits Programs in this case have done audits of Dr. Soliman's billing, and "peer reviews," and have historical data about the billing patterns of physicians in certain categories. They have provided information to the government about their procedures, their contracts with the accused, payment processing, deductions and

---

[6]  The Medicare Modernization Act requires Carriers to educate physicians on billing compliance.  The Centers for Medicare and Medicaid Services ("CMS")  contracts with Carriers, who in turn, make claims payments for physician services covered by Medicare Part B. Carriers are responsible for employing safeguards and providing information to providers on billing.  They also conduct claims review to determine if physician claims are reasonable and necessary and billed with proper codes. Under the Progressive Corrective Action ("PCA") initiative,  Carriers must assist physicians in interpreting the rules and applying them to specific billing situations.  The PCA also requires the Carrier to provide data to the physician about how her billing pattern varies from other physicians in the same specialty or locality. CMS directs Carriers to contact physicians by phone to provide specific information on billing matters and to follow-up with a letter. A key focus is emphasis on Carrier feedback to physicians in the medical review process based on:

a.  Automated checks (or manual reviews where no automated information) to detect missing information, services that do not correspond to diagnosis codes or obvious errors;

b.  Carrier Prepayment Medical Reviews using specific criteria to identify services that the Carrier determines to have a high probability of being billed in error; and

c.  Carrier Postpayment Review to determine if claims were paid in error with a focus on the claim and use of local medical review policies to compare to national or local coverage policies.  (Exhibit 4 Recent CMS Reforms Address Carrier Scrutiny of Physicians Claims For Payment GAO 02-693, May 2002 at pp. 4-6; 15-16).

**Documents – Rule 16(a)(1)(E)**

disallowances in their handling of his billings.  They have done reviews and have from time to time renewed their arrangement with him.  They have had communications with him. Any documents in this regard are absolutely essential to the preparation of the defense.

44.    Similar records may exist for independent practice associations, such as RIPA, referred to in ¶18 of the discovery schedule.

45.    We have been unsuccessful in getting any clue from the government concerning what such documentation it has in its possession, and it has declined to share with us any efforts, or willingness, to obtain this information.

46.    These documents are not privileged, and they will not only lead to admissible evidence but will be essential in confronting the government's case.

*Other documents*

47.    Rather than require the defendant to guess about other types of documentary information or evidence which has been collected in connection with this case or which might be material to the preparation of the defense or may be used by the government at trial or which might be favorable to the defendant, the government should be required to specify any additional documents in its possession or under its control which relate in any way to the present case so that the discoverability of that information might be evaluated at the present time.

*Tapes, photographs, recordings, electronic surveillance*

48.    The government has indicated that it is unaware of tapes, or photographs being involved in the case.

49.    Our investigation suggests, however, that there were "controlled" phone calls to Dr. Soliman, orchestrated by law enforcement officers in connection with this investigation, using at least one employee to make the call on behalf of the investigators.

27

**Former Employees**

50.    Often, as well, videotapes are made in connection with the execution of search warrants.

51.    Therefore, the government should be directed to exhaustively inquire as to the existence of any such discoverable property.

52.    In any such instance it is also necessary for the defense to be advised of how the original information was recorded, where each original recording (or negative) is being stored and of the process utilized in reproducing the copies of this material which are being made available to the defense.  This relates to the integrity not only of the reproductions which are being offered to the defense at the present time, but also of further reproductions which may be made at a later time.

53.    Additionally, the information which has surfaced in our own investigation, to the effect that some witnesses were told, falsely,  that Dr. Soliman was providing money to "terrorists," leads us to inquire whether there was any electronic surveillance of any sort, under any authority, including FISA, relevant to this case.

### Former Employees

54.    Among the records seized from Dr. Soliman were, apparently, employee files. As a result, and as a result of the great difficulty we would have in trying to locate those records among the 64,000 records on the CD-ROM discs provided to us, we were unduly hampered in our efforts to investigate this case through discussions with former employees. Some we have not been able to find.

55.    As a result of this impediment put on us, the government ought to provide us with the names and addresses and telephone numbers, and other contact information it has for all former employees of Dr. Soliman for our use in investigation.

56.    Additionally, as reflected in the attached affidavit of David Hammond, it also appears that some employees were instructed not to talk to the defense, with the additional

**Favorable information**

implication that such cooperation with the defense could result in their prosecution as an accessory of some sort.

57.    Additionally, it appears also that some former employees may have been told, or that it was insinuated, falsely, by government investigators, for reasons best known to those investigators, that Dr. Soliman was supplying money to "terrorists." This is believed to be the cause for some witness' refusal to cooperate or make themselves accessible to us, out of the fear that they may be retaliated against by "terrorists." We have been informed that one witness is "in hiding" because of this.

58.    A hearing should be conducted to determine the extent to which this did occur, a remedy should be fashioned, such as requiring the government to inform witnesses in writing that they are encouraged to share what they know with defense investigators, and that any hint that Dr. Soliman was suspected of involvement in any other illegal activities was not true, and to provide alternative remedies, such as permitting the defense to depose those witnesses who are uncooperative.

### Favorable information

59.    The Court must be alert to the fact that the government in this district at least, while mouthing that it "understands" its obligations under *Brady v. Maryland* and its progeny, and its continuing duty thereunder, in fact does not accept *Brady v. Maryland*, does not agree that it imposes an actual affirmative discovery obligation on the government, and fails even to follow Department of Justice policy in this regard. The result is that the government construes its "*Brady*" obligations in a way which precludes the discovery of, and timely delivery of, information constitutionally required to be provided to the accused. This case provides examples of these facts.

60.    **First** of all, the government only acknowledges that it must turn over "exculpatory" evidence to the accused, but not as an affirmative discovery obligation, but in order to avoid sanction in the event the government is caught failing to do so. As our

**Favorable information**

memorandum makes clear, the terms "exculpatory" or "evidence" do not define, and never have defined what the Constitution requires to be disclosed under *Brady*. It is *favorable information* which must be disclosed. This is not only a matter of constitutional doctrine, it is a matter of ethics as well.

61. Lest there be any doubt about how calculating the government is in its use of language, the official DOJ position is that *Brady* does not reach information which "may not, on its own, result in an acquittal." USAM 9-5.001 "Policy Regarding Disclosure of Exculpatory and Impeachment,"[7] section "C." The government views information which *it deems* "inadmissible" as information within its *Brady* obligation. This would undoubtedly include "inadmissible" information of the type the Supreme Court has ruled error to exclude under th compulsory process clause of the 6th Amendment in such cases as Washington v. Texas, Chambers v. Mississippi, Green v. Georgia, and, most recently, Holmes v. South Carolina. All these cases involved reversal of convictions where evidence was inadmissible under the rules of evidence, but where its exclusion violated the Right to Present a Defense found in the compulsory process clause.

62. Therefore, this Court has to be most circumspect when assured by the government that it will abide by its obligations under *Brady v. Maryland*, because the official policy of the Department of Justice contrives to interpret its obligation in unconstitutionally narrow terms.

63. **Second**, despite the efforts to reconstruct the *Brady* doctrine as merely a remedy for "suppression" of "exculpatory" evidence, the modern and ethical interpretation of the prosecutor's duty is that of a discovery obligation, designed to insure that trials are fair to begin with, not that the accused has a remedy if the government is caught too late in any dereliction of its duty.

64. **Third**, the government does not typically reach out to the agencies or entities

---

[7] http://www.usdoj.gov/usao/eousa/foia_reading_room/usam/title9/5mcrm.htm

it "represents" — and in this case there is no question that the government feels that it "represents," and is even answerable to, the Health Care Benefits Programs — for them to gather "favorable" information, or even "exculpatory" information.

65.    Nor can we be assured that the  private carriers —  whether Health Care Benefit Programs or a contractor for Medicare — will themselves search for "favorable" information or recognize it when they see it, or that they have been directed to do so.

66.    As far as federal agencies, such as Medicare ("CMS"), we have to be concerned because those federal investigative agencies who have addressed the issue, the FBI and FDIC,  have asserted that they have no responsibility  to collect and bring to the prosecutor's attention any favorable information.[8]

67.    In our case, while the government has focused simply on the billing codes, and evidence that Dr. Soliman billed consistently at higher level than was supported by his HCFA claim,  it has refused to accept the fact that Dr. Soliman attached to his claims medical notes concerning what he did in the office visits in issue, is a favorable fact with respect to his awareness of any wrongdoing, or wilfulness in the commission of any offense.  However the relevance of Dr. Soliman's attachment of medical notes to his bills was brought up to the Health Care Benefit Programs at the same time that they began enlisting the help of the government.   This was in correspondence from Dr. Soliman's then attorney to the attorney for Excellus, dated May 6, 2004. Letter, Hogan to Ralph W. Cox, General Counsel to Excellus.

68.    The government was also informed of this position in pre-indictment

---

[8] See Declaration of FBI's David M. Hardy (USDC Dkt #16) ¶18 in *NACDL v. Department of Justice*, 2006 WL 2583691 (DDC 2006)(stating that the FBI's disclosure of wrongfully withheld Brady material in its possession "would not shed light on how" the FBI performs its statutory duties); FDIC Responding Brief [USDC Dkt. #177] p.4 in *Martin v. Department of Justice*, 488 F.3d 446 (D.C.Cir.2007) (claiming that FDIC "was never in a position to produce Brady materials because it was not a party to [Harold Martin's] criminal prosecution"); FDIC Reply [USDC #14] p.2 in  *NACDL v. Department of Justice* (claiming FDIC could not have wrongfully withheld *Brady* material because only prosecutors and the courts decide whether a document is *Brady* material,)

discussions, and demand was made for the disclosure of the actual claims sent in by Dr. Soliman with *any attachments*.    However as recently as August 14, 2007, the government maintained it was "unaware that extrinsic documentation was generally attached to Medicare or private payor claims" and without "specific information concerning a particular claim, rather than suspicion or speculation" it would not follow up on this discovery demand. Prevailed upon to follow up anyway, information began to come out that in fact the carriers agreed that most of the excellus claims, and many of the Medicare claims had additional supporting materials that had not been provided to the defense.

69.    It is not our position that this struggle to get favorable information is the result of bad faith by the government.  But it is the case that the government essentially takes a very narrow  view of what constitutes *Brady* material, and the operant principle seems to be that if the information does not persuade the government that its case is mistaken — or, here, that the HCFA 1500 claim forms were not false — then the information is not *Brady* material, even if it is relevant and favorable on the issue of the  wilfulness of the conduct of the accused.

*Timing of disclosure  — Favorable Information*

70.    In order to effectuate the Right to Present a Defense which is embodied in the compulsory process clause of the Sixth Amendment, and to the right to a fair trial, all favorable information must be disclosed to the accused immediately or as soon as its existence comes to the attention of the government or its agents.

71.    Of those districts which have established local rules for pretrial disclosure, the vast majority require the disclosure to commence soon after arraignment, and continue thereafter.  The most common time frame is "within fourteen days of the arraignment," followed by "within seven days of the arraignment," and "within ten days of the arraignment." Some districts have no specified time requirements for disclosure, using terms such as "as soon as reasonably possible." See, "Brady v. Maryland Material in the United

**Favorable information**

States District Courts: Rules, Orders, and Policies," Report to the Advisory Committee on Criminal Rules of the Judicial Conference of the United States, by Laural Hooper and Sheila Thorpe, Federal Judicial Center, May 31, 2007, p. 8.[9]

72.    Additionally, the Department of Justice, in response to suggestions that Rule 16 should be amended to codify the *Brady* rule, in order to promote actual compliance, has made changes to its manual designed to indicate that it can enforce better compliance by its own rules and that a rule change is not necessary.   Here the Department of Justice has announced as its official policy that *Brady* material must be disclosed when it is discovered, not at the latest point prior to trial that might avoid entitling the accused to an adjournment. See October 19, 2006 Memorandum from the Deputy Attorney General, relating to the addition of §9-5.001 to the United States Attorney's Manual. ("Exculpatory information must be disclosed reasonably promptly after it is discovered.")[10]

73.    Despite al this, the position of the government in its response to our discovery demand was that it would provide "*exculpatory evidence*" when it provides §3500 material, and then attempts to ward off any attempt by the Court to direct immediate production of *Brady* material by then assuming that the Court has no greater power to direct when favorable information is disclosed than when §3500 material is disclosed.

74.    The Court must direct that any favorable information be provided to the accused promptly after its existence is discovered, and that the government exercise due diligence in attempting to locate such information.

---

[9]  http://www.fjc.gov/public/pdf.nsf/lookup/bradyma2.pdf/$file/bradyma2.pdf

[10]  Of course the Manual is incorrect in describing the material required to be disclosed as "exculpatory." The Supreme Court in *Brady v. Maryland*, the subject of the memo,  never used the word "exculpatory."  It referred to "favorable information."   The Judicial Center Report also noted that most courts defining the scope of *Brady* material adhere to the actual language of the Supreme Court in *Brady*: "favorable information."

**Favorable information**

# Conclusion

WHEREFORE the undersigned respectfully requests that the relief sought in the forgoing motions be granted, and that a hearing be conducted, as requested in ¶ 58.

December 3, 2007

/s/ Mark J. Mahoney

_____

Mark J.  Mahoney
HARRINGTON & MAHONEY
1620 Statler Towers
Buffalo, NY 14202-3093
Tel: 716-853-3700
Facs: 716-853-3710
mmahoney@harringtonmahoney.com

United States District Court
Western District of New York

| | |
|---|---|
| United States of America,<br>*Plaintiff*<br><br>*v.*<br><br>Ezzat Soliman,<br>*Defendant* | **Certificate of Service**<br>Indictment № 06-Cr-00236-<br>RJA-HBS |

Ivonne DeLuca, a Legal Assistant with the office of Harrington & Mahoney, located at 1620 Statler Towers, Buffalo, New York  14202-3093  affirm to be true and state under penalty of perjury that on December 3, 2007 the **Defendant's Pretrial Motions III: Discovery, Particularization, Surplusage** was electronically filed with the Clerk of the District Court using its CM/ECF system, which would then electronically notify the following CM/ECF participants on this case:

   1.  Robert Trusiak, AUSA

               /s/ Ivonne DeLuca
               Ivonne DeLuca

Sworn before me this
3rd day of December, 2007

/s/ Denise M. Dzierzewski

Denise M. Dzierzewski
Notary Public, State of New York
Qualified in Erie County
My Commission Expires 8/17/2010